Filed 6/30/25  P. v. Carter CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOHN JACOB CARTER,<br><br>    Defendant and Appellant. | D083274<br><br><br>(Super. Ct. No. SCE417534) |


APPEAL from a judgment of the Superior Court of San Diego County, Herbert J. Exarhos, Judge.  Affirmed.

Jared G. Coleman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

## I.  INTRODUCTION

About 90 minutes after defendant John Jacob Carter's wife served him with a domestic violence restraining order (DVRO), he called her and said he

was " 'getting guns,' " he would be at her workplace when her shift ended, and she should " 'prepare to die.' " A jury convicted defendant of making a criminal threat (Pen. Code,[1] § 422) and violating a restraining order (§ 273.6, subd. (a)). The trial court sentenced him to four years in prison.

On appeal, defendant contends the trial court erred by failing to instruct the jury sua sponte on the lesser included offense of attempted criminal threat, which he maintains was warranted by his wife's equivocal trial testimony about whether she was in sustained fear after receiving defendant's threat. We conclude that even if the trial court erred in this respect, the error was harmless.

Defendant also contends the trial court erred by admitting (1) evidence of three prior instances of domestic violence as propensity evidence under Evidence Code section 1109, and (2) a recorded jail phone call the day after his arrest that contained references to "DUI" and cocaine use. We conclude the trial court acted within its discretion in admitting this evidence.

Accordingly, we affirm the judgment.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

Defendant and Theresa began dating in 2016 and married in 2018. Theresa had three children from a relationship prior to meeting defendant and she worked as a nurse at a care facility for the elderly. Their relationship was tumultuous and punctuated with problematic alcohol use and domestic violence.

---

[1]     Undesignated statutory references are to the Penal Code.

## 1. Charged Offenses

The events that led to the charged offenses occurred from April 24 to April 28, 2023.

On Monday, April 24, defendant abruptly woke Theresa at 5:00 a.m. (an hour earlier than she usually awoke for work) and accused her of having an affair with his brother. Defendant had seen Facebook messages between Theresa's account and his brother's account, but Theresa explained to defendant that she was communicating with the brother's wife, Ashley, through the brother's account. Defendant did not believe Theresa and continued to accuse her of infidelity. Theresa testified at trial that defendant was angry and upset but was quiet and not yelling. Theresa acknowledged that when she applied for a DVRO two days later (April 26), she wrote, "[Defendant] woke me up at 5:00 a.m. through 7:30, accusing me of sleeping with his brother, yelling, screaming, following me around, threatening that Ashley is going to kill me, Sherry[2] is going to beat my ass, shoved me into the closet."[3] Defendant also warned, " 'Watch your back.' " After the fight, defendant told Theresa, " 'That's it. I'm leaving.' " When Theresa came home on her lunch break that day, defendant had already moved out. Theresa changed the locks. At the time, Theresa was the primary income earner in the relationship.

The next day, Tuesday, April 25, defendant showed up at Theresa's work and asked for money. Theresa initially testified defendant did not make any threats about her work and she could not recall if he took any

---

[2] "Sherry" is not identified in the record.

[3] Theresa testified she did not remember defendant doing or saying these things, adding she "maybe . . . put a little extra on it" to "make sure [she] got the restraining order."

actions involving her car. But Theresa admitted that in her DVRO declaration she wrote: "[Defendant] showed at work demanding money. Said, 'I'm going to get you fired.' Blocked the back of my car in with his."

The following day, Wednesday, April 26, defendant confronted Theresa again. Theresa initially testified she did not remember exactly what happened on this occasion. But she confirmed that in her DVRO declaration she wrote: "[Defendant] was waiting in apartment parking lot demanding money, slammed on gas, drove car towards me. Once I was in the car, blocked me in again."

The same day, Theresa went to the courthouse and applied for a DVRO. In addition to describing defendant's conduct that week, Theresa wrote in her DVRO declaration that defendant physically abused her in 2018 and served prison time as a result; a previous restraining order against defendant had since expired; and although defendant had not physically harmed her recently, she "would like a new protective order" because she "feel[s] things are escalating." Theresa requested that the DVRO also protect her daughter Hailey, who was 20 years old at the time of trial, because she was staying with Theresa "on and off." The court issued a temporary DVRO against defendant and set a hearing for further proceedings.

Around 3:00 p.m. on Friday, April 28, defendant showed up at Theresa's work, engaged her in the back parking lot, and asked for money. Theresa gave him whatever money she had in her wallet and handed him the DVRO. Theresa testified defendant initially thought she was serving divorce papers, but she explained that the DVRO meant only that he could no longer come to her work. Defendant drove away upset. Theresa resumed her work shift, which was to end at 5:00 p.m.

4

Sometime between 3:00 and 4:30 p.m., Hailey took a rideshare from her nearby job to Theresa's work so they could carpool the rest of the way home in Theresa's car. Hailey waited in the car while Theresa finished her shift.

At 4:32 p.m., defendant called Theresa. She answered the call in her workplace restroom. Defendant began arguing about the fact Theresa had reopened a Facebook account. Theresa's trial testimony about the ensuing events was equivocal. She testified she "thought [she] heard something that [she] didn't like" — that defendant "was going to come and hurt [her] or something." She testified she was unable to hear "exactly" what defendant said because she was in the restroom, and she can "hardly ever understand [defendant] on the phone" because "he talks very fast" and "is not very clear speaking."

Theresa called 911 at 4:33 p.m. and, while still speaking to the dispatcher, went to the parking lot to bring Hailey inside for her safety. At trial, Theresa tried to minimize the 911 call as merely requesting a "welfare check" to "maybe just kind of drive by, check out the situation, [and] make sure everything is cool." A recording of the 911 call was played at trial. Theresa told the dispatcher, "[H]e called me, he called me, he called me and he said 'I'm at my mom's storage right now, um and I'm getting her guns. Prepare to die, I'll be there at 5 o'clock." Theresa recounted this threat to the dispatcher five times during the 911 call, mimicked how defendant conveyed the threat, and insisted "that was *exactly* what he said." Theresa told the dispatcher she was "absolutely, 100 percent" certain that defendant's mother "in fact" had "several" guns in a storage unit. Theresa also reported that she "heard [the mother] talking in the background" during defendant's call so Theresa "kn[ew] for sure he's with her." When the dispatcher asked if defendant drives a vehicle, Theresa responded, "Yeah, he has my

5

Hyundai . . . I gave him the car, . . . I still pay for it, but you know nothing's good enough, *now he has to kill me*." (Italics added.) Theresa confirmed she wanted to press charges for defendant's threat. After confirming that Theresa and Hailey were inside, the dispatcher advised that police would respond as soon as possible.

On cross-examination, Theresa testified "there is no way" she could be "100 percent sure" about what defendant said, and that "he could have said something like '*I'm* prepared to die,' " which "would have made sense because he was extremely upset." (Italics added.) She also testified that "the truth is that [defendant] didn't threaten [her]." On redirect, she acknowledged she called 911 "basically" because "there was a potential fear that something may happen so [she] wanted a welfare check."

After the 911 call, defendant called Theresa or sent her text messages denying he had threatened her.

A sergeant with the El Cajon Police Department was notified of Theresa's call and requested that Theresa and Hailey go to the police station for safety. Even though Theresa testified that, "as a nurse, your eyes could be bleeding and you don't leave work," she told her supervisor "there was an emergency at home" and left work early to go the police station because she was "not willing to die for [her] job."

At the police station, Theresa and Hailey met Officer Robert Farren in the parking lot. The officer testified Theresa "appeared to be quite scared" and was "flustered" and "shaking."[4] Hailey also testified that Theresa

---

[4] On cross-examination, Theresa testified she was not afraid of defendant at that point and was upset because of defendant's accusation that she was having an affair with his brother.

6

appeared to be in a "scared mental state."[5]  Theresa testified that she told Officer Farren what defendant had said on the phone, but she "also explained . . . that [defendant] denied it" and that she did not "know for sure" what he said, "but that's what [she] thought [she] heard."  Theresa's conversation with Officer Farren was recorded on his body-worn camera and the recording was played at trial.

In the recording, Theresa chronicled the events of the week, culminating in defendant's threatening phone call.  As to that call, Theresa told Officer Farren, "He calls me, 'I'm at my mom's storage, uh, I'm getting her gun,' which I know she has guns and, uh 'I'm gonna be there at 5:00, prepare to die.' "  Theresa repeated this statement twice to another police officer who later joined the conversation.  Theresa told Officer Farren that defendant contacted her and denied making the threat, "but there's no way [she] can misinterpret that for something else."  Theresa reported that she had previously seen a photograph of defendant holding a gun that may have been fake, but she "knows" that defendant's mother "has real guns."  Officer Farren advised Theresa that, "given the . . . severity of this incident, . . . and the potential for it to go really bad," the police would try to apprehend defendant "right away."  Theresa responded, "I'm gonna go try to stay at a hotel or something for tonight.  I'm just scared to death."  Theresa added, "I can't believe this.  I'm, like, so shocked."  She reiterated her plan to stay at a hotel.

---

[5]    Hailey admitted at trial that she had previously told a defense investigator that Theresa did not seem scared.  But Hailey confirmed at trial that Theresa was, in fact, scared and that she (Hailey) was also sometimes afraid of defendant.  Hailey explained she had lied to the investigator because she was tired of the "drama" between defendant and Theresa and "didn't want to deal with any of [it]."  Hailey admitted that when she was younger she sometimes lied to protect defendant.

Police apprehended defendant later that evening. He had no firearms in his possession. The call log on defendant's cellphone showed that he called Theresa five times after being served with the DVRO.

The next day, defendant called Theresa from jail using another inmate's identification number.[6] A recording of the call was played at trial. Defendant repeatedly called Theresa "a f---ing rat" for calling the police, instructed her to contact the district attorney's office and his probation officer to get the charges dropped, told her that his mother would move in with her while he was incarcerated because he did not trust Theresa not to "bring a dude there every night," insulted and demeaned Theresa's intelligence and appearance, and threatened to harm Hailey after Hailey said in the background that the call "is recording" and "you guys have a restraining order."[7]

Investigator Markland testified as an expert about the "cycle of violence" in relationships afflicted with domestic violence. She explained that the cycle consists of a "tension-building phase" during which the victim "walk[s] on eggshells . . . to kind of prevent any escalating"; an "acute explosion" stage that often consists of physical violence or threats and is usually when law enforcement becomes involved; and a "honeymoon stage where a lot of times there are apologies," promises by the abuser to reform, and "a lot of times [the victims] will try to drop charges" or recant. The

---

6      District Attorney Investigator Cecilia Markland explained at trial that, "especially in domestic violence cases, a lot of times there is a . . . restraining order, so [defendants] know calls are recorded and they are not allowed to talk to the victim, so they will use a different inmate's [jail phone] pin number to try and get around that."

7      When Theresa confronted defendant about the threat to Hailey, defendant said, "I'm just kidding. . . . You know it's not a threat."

8

investigator testified that defendant's conduct during the jail call reflected several aspects of the cycle of violence — blaming Theresa, calling her "a f---ing rat," denying the acute explosion occurred, emotionally abusing Theresa, and advising that his mother would chaperone Theresa. The investigator also testified that she tried to interview Theresa and Hailey but neither cooperated. When asked hypothetical questions that mirrored the evidence in this case, Investigator Markland opined it was consistent with the cycle of violence.

## 2. Prior Instances of Domestic Violence

The prosecution introduced propensity evidence under Evidence Code section 1109 regarding three prior instances of domestic violence committed by defendant against Theresa. Theresa testified generally that she did not recall the details of those incidents, so the evidence was introduced through the testimony of the sheriff's deputies who responded to the incidents.

The first incident occurred on March 3, 2018. Two sheriff's deputies responded to an incomplete 911 call from defendant and Theresa's residence. When the deputies knocked at the door, defendant was inside. Theresa came out of the residence and walked down the driveway. One deputy stayed with defendant while the other went with Theresa. Both deputies testified that defendant yelled from the house for Theresa not to tell the deputy anything. The second deputy testified that Theresa "was visually upset" and had "a lump on her forehead" and a small cut on one finger. Theresa told the deputy she and defendant were arguing because defendant went out drinking with friends instead of staying home with her. When asked how she sustained her injuries, Theresa first said "she couldn't remember," and then said she was "mopping and . . . fell." Theresa also said "she didn't want to be labeled a snitch." Theresa was taken to the hospital, where she revealed to one of the

9

deputies that during the argument with defendant "he ended up throwing her against the wall and . . . beat her ass." The deputy saw that Theresa also had an abrasion on the bridge of her nose. The deputy documented in his report that defendant and Theresa were possibly intoxicated.[8]

The second incident occurred about three months later, on June 9, 2018. Sheriff's deputies responded to a call from a neighbor about yelling and potential domestic violence between defendant and Theresa. When the deputies arrived, defendant had already left and Theresa appeared injured, fearful, and intoxicated. Theresa's lips were bloodied, she had lacerations on her lips and nose, and a bruise was forming on the bridge of her nose. Theresa told one of the deputies that while defendant was out, she found Facebook messages that revealed defendant was cheating on her. Theresa sent defendant a text message "saying they were done" and "that he could come pick up his belongings." She then went to bed. Theresa told the deputy "that the next thing she knew, she woke up to [defendant] on top of her punching her in the face and neck area" about 15 to 20 times. Theresa ran out of the house yelling for somebody to call 911.

The parties stipulated that defendant was charged with two counts of inflicting corporal injury against a significant other (§ 273.5, subd. (a)) in connection with the March and June 2018 incidents; defendant pleaded guilty to the count arising from the March incident; the charge related to the June incident was dismissed; and defendant was sentenced. During trial on the current charges, Theresa testified that she had previously testified at the preliminary hearing for the 2018 charges that she could not remember those incidents.

---

[8]    Theresa acknowledged at trial that she "sometimes over-consume[s] alcohol," which has caused problems in her relationship and sometimes causes memory issues.

The third incident occurred on August 9, 2022. Sheriff's deputies responded to a 911 call about a female domestic violence victim pleading for help. When deputies arrived, a neighbor told them it sounded like " 'somebody is getting their ass kicked' " next door at defendant and Theresa's apartment. The deputies knocked on the door and Theresa answered. She appeared "very frantic" and repeatedly stated " 'he's gone.' " One of the deputies testified he saw an obvious bruise on Theresa's right eye, another bruise on the inside of her elbow, and abrasions and scratches on her right thigh. The deputy also testified that Theresa "didn't have specific details of exactly what happened," but that defendant had hit her "roughly 10 to 15 times."

The parties stipulated that defendant was charged with one count of inflicting corporal injury against a significant other (§ 273.5, subd. (a)) in connection with the August 2022 incident, but the case was later dismissed. Theresa testified in the current trial that defendant did not hit her during the August 2022 incident and that her bruised eye was caused by Hailey inadvertently hitting her with a cellphone while they were wrestling over it. Hailey corroborated this at trial.

**B. Procedural Background**

In the current case, the prosecution charged defendant with one felony count of making a criminal threat (§ 422), based on the April 28, 2023 phone call to Theresa. That charge carried the additional allegation that defendant committed the offense while on parole. The People also alleged one misdemeanor count of violating a protective order (§ 273.6, subd. (a)) for making the threatening call after being served with the DVRO. The charging document alleged defendant had suffered two prior felony convictions that rendered him presumptively ineligible for probation (§ 1203, subd. (e)(4)); one

11

prior serious felony conviction for purposes of the five-year enhancement (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)); one prior strike conviction (§§ 667, subds. (b)–(i), 668, 1170.12); and several aggravating circumstances relating to the defendant (Cal. Rules of Court, rule 4.421(b)(1), (4), (5)).

After the close of evidence, defendant admitted the on-parole, prior conviction, and aggravating circumstance allegations. The jury returned guilty verdicts on both counts.

At sentencing, the trial court struck defendant's prior serious felony conviction but not his prior strike conviction. On the criminal threat conviction, the court imposed the middle term of two years, doubled to four years for the prior strike conviction. For the protective order violation, the court sentenced defendant to time served.

## III. DISCUSSION

### A. The Trial Court's Failure to Instruct on the Lesser Included Offense of Attempted Criminal Threat Was Harmless

During a conference on jury instructions, defense counsel agreed with the trial court that no lesser included offenses were implicated. Accordingly, the trial court did not instruct the jury on attempted criminal threat. Defendant now contends the trial court prejudicially erred by failing to do

so.[9] We conclude that even if the trial court erred by failing to instruct regarding attempted criminal threat, the error was harmless.

"A trial court has a sua sponte duty to 'instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser.' " (*People v. Shockley* (2013) 58 Cal.4th 400, 403; see *People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*).) "Substantial evidence in this context is evidence from which a reasonable jury could conclude that the defendant committed the lesser, but not the greater, offense." (*Shockley*, at p. 403; see *Breverman*, at p. 162.) "In deciding whether evidence is 'substantial' in this context, a court determines only its bare legal sufficiency, not its weight." (*Breverman*, at p. 177.) We review de novo whether the trial court erred by failing to instruct on a lesser included offense. (*People v. Licas* (2007) 41 Cal.4th 362, 366.)

To prove the crime of criminal threat under section 422, "the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat . . . was 'on its

_____

9      " '[A] defendant may not invoke a trial court's failure to instruct on a lesser included offense as a basis on which to reverse a conviction when, for tactical reasons, the defendant persuades a trial court not to instruct on a lesser included offense supported by the evidence. [Citations.] In that situation, the doctrine of invited error bars the defendant from challenging on appeal the trial court's failure to give the instruction.' " (*People v. Horning* (2004) 34 Cal.4th 871, 905.) Although defense counsel agreed with the trial court that no lesser included offenses were implicated, it appears this agreement was " 'mere[ly] unconsidered acquiescence' " (*ibid*.) rather than a tactical decision. Accordingly, the doctrine of invited error does not preclude defendant from raising this challenge.

face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227–228 (*Toledo*), quoting § 422, subd. (a).) "Case law defines 'sustained fear' as 'a period of time that extends beyond what is momentary, fleeting, or transitory.' " (*People v. Brugman* (2021) 62 Cal.App.5th 608, 634.)

"[A] defendant properly may be found guilty of" the lesser included offense of "attempted criminal threat whenever, acting with the specific intent to commit the offense of criminal threat, the defendant performs an act that goes beyond mere preparation and indicates that he or she is putting a plan into action." (*Toledo*, *supra*, 26 Cal.4th at p. 230.) "[S]ome of the most common situations that would support a conviction of attempted criminal threat . . . involve circumstances in which the defendant in fact has engaged in *all* of the conduct that would support a conviction for criminal threat, but where the crime of criminal threat has not been completed only because of some fortuity outside the defendant's control or anticipation." (*Id.* at p. 234.) As relevant here, this may occur when the defendant, "acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear." (*Id.* at p. 231; see *ibid.* [giving examples in which the

14

threat may not be received by the victim or the threat is not understood by the victim].)

Defendant contends the trial court should have instructed on attempted criminal threat because "Theresa did not act as if she was in 'sustained fear' due to" defendant's threat and testified at trial that she was not. The People disagree, arguing that "any recantation from [Theresa] was simply not credible given the other evidence presented at trial." Because we do not weigh conflicting evidence when determining whether substantial evidence exists for purposes of requiring instruction on a lesser included offense (*Breverman*, *supra*, 19 Cal.4th at p. 177), we will assume without deciding that substantial evidence supported giving the instruction here. But as we now explain, we conclude the failure to give that instruction was harmless.

In a noncapital case, "error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under [*People v. Watson* (1956) 46 Cal.2d 818]." (*Breverman*, *supra*, 19 Cal.4th at p. 178.) Under *Watson*, " 'a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 955.) This review " 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration.' " (*Id*. at p. 956.) In undertaking this inquiry, "an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*Breverman*, at p. 177.)

Considering the relative strength of the evidence showing that Theresa was in sustained fear after receiving defendant's threat and the comparative weakness of the evidence to the contrary (*Breverman, supra*, 19 Cal.4th at p. 177), we find the claimed instructional error harmless because it is not likely that the jury would have convicted defendant of attempted criminal threat if it had been given the option to do so.

The evidence of Theresa's sustained fear was compelling. First, defendant has a long history of abusing her. (See *People v. Allen* (1995) 33 Cal.App.4th 1149, 1156 ["The victim's knowledge of defendant's prior conduct is relevant in establishing that the victim was in a state of sustained fear."]; cf. *In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1138 ["In contrast to other cases upholding section 422 findings, there was no evidence in this case to suggest that [the defendant] and [the victim] had any prior history of disagreements, or that either had previously quarreled, or addressed contentious, hostile, or offensive remarks to the other."].) Defendant pleaded guilty and was sentenced for physically abusing Theresa in 2018. The prosecution introduced evidence of another violent incident in 2022. And in the week leading up to defendant's threat, he blocked Theresa in her car twice, drove his car at her, shoved her into a closet, threatened that other women would assault her, and warned her to " 'watch [her] back.' "

Second, Theresa's conduct upon receiving the threat strongly supports the finding she was in sustained fear. She immediately called 911. (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1538 [calls to the police are evidence of the victim's sustained fear].) While on the phone with the dispatcher, Theresa went to the parking lot to bring Hailey inside for her safety. Despite testifying that nurses do not leave work early, Theresa did so, telling her supervisor it was due to "an emergency at home," and explaining at trial that

16

she was "not willing to die for [her] job." Theresa then drove to the police station, where Officer Farren observed her "to be quite scared," "flustered," and "shaking." Hailey also testified Theresa was, in fact, scared. We have viewed the recording from Officer Farren's body-worn camera and agree Theresa appeared to be distraught and fearful.

Finally, Theresa's statements strongly support the finding she was in sustained fear. When she reported defendant's threat to the 911 dispatcher and Officer Farren, Theresa had no doubt about the precise content of the statement. During the 911 call she repeated the threat five times nearly verbatim; mimicked how defendant conveyed the threat; confirmed "that's *exactly* what he said"; and bemoaned the fact that not only had defendant taken her car, "but . . . now he has to kill me." During her conversation with Officer Farren, Theresa reported that defendant had made the same threat as reported in the 911 call; repeated it twice to another officer who joined the conversation; stated "there's no way [she] can misinterpret [the threat] for something else"; stated she was "so shocked" and "just scared to death"; and stated twice that she intended to stay at a hotel that night.

Theresa also told the 911 dispatcher and Officer Farren that she was certain defendant's mother owns firearms and that Theresa knew defendant was with his mother because Theresa heard the mother's voice in the background of defendant's call. This indicates Theresa believed defendant had the present means to carry out his threat, supporting the finding of her fearful mental state. Theresa also told the operator she wanted charges filed in connection with defendant's threat, further indicating Theresa took the situation seriously and feared defendant.

Compared to this overwhelming evidence that Theresa was in sustained fear, the evidence to the contrary is weak. Theresa's trial

17

testimony that she was not certain defendant actually threatened her and that she was not in fear are flatly contradicted by her unvarnished statements to the 911 dispatcher and Officer Farren in the immediate aftermath of the threat. The jury heard these convincing statements, as have we. The jury also heard defendant's surreptitious jail call to Theresa during which he repeatedly dissuaded her from pursuing charges. Indeed, both Theresa and Hailey refused to cooperate with the prosecution before trial. The prosecution also introduced evidence establishing Theresa's history of making credible contemporaneous reports of domestic violence followed by recantation. This pattern is consistent with the cycle of violence, about which Investigator Markland testified as an expert.

Defendant also cites Theresa's testimony that she sought a DVRO only to prevent defendant from harassing her at work. Many of the same considerations that undermine Theresa's credibility regarding defendant's threat likewise apply to this claim. Moreover, the fact the jury found defendant guilty of violating the DVRO merely for calling Theresa rather than for visiting her workplace suggests the jury disbelieved her on this point. (See *People v. Lewis* (2001) 25 Cal.4th 610, 646 ["Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions."].) And, in any event, Theresa's state of mind when seeking a protective order on April 26 does not undermine the compelling evidence that she was in sustained fear on April 28 after receiving defendant's threat.

On this record, any error in the trial court's failure to instruct the jury regarding the lesser included offense of attempted criminal threat was harmless under the *Watson* standard.

**B. The Trial Court Did Not Abuse Its Discretion by Admitting Evidence of Defendant's Prior Domestic Violence and the Jail Call**

Defendant contends the trial court erred by admitting evidence of his prior acts of domestic violence and the recorded jail call because this evidence was substantially more prejudicial than probative. We are not persuaded.

### 1. Background

The People moved in limine to admit evidence regarding defendant's prior domestic violence against Theresa (the March 3, 2018, June 8, 2018, and August 9, 2022 incidents described above) and three calls defendant made to Theresa from jail after his arrest on the current charges. Defendant opposed the motion and sought to exclude the evidence.

The prosecutor argued the evidence regarding prior domestic violence was admissible under Evidence Code section 1109 and was highly probative "as a necessary backdrop to the dynamics that inform [Theresa] and [d]efendant's relationship" because it "provides a crucial background to [Theresa]'s fear during the charged offense, as well as an understanding of [her] pattern of recanting and the cycle of violence that [d]efendant subjects her to." Defense counsel argued the prior incidents were unduly prejudicial. The trial court found the evidence admissible because the pending criminal threat charge "involves a threat of physical violence" and, thus, the "previous acts of physical violence indicate whether . . . [Theresa] was legitimately in fear because of those threats."

The prosecutor argued the jail calls were admissible to show Theresa's state of mind immediately after reporting the incident, to establish the credibility of her initial statements, to explain why she might "recant or minimize the conduct after charges were filed," and to "show the dynamics of

power and control" between them.  After initial argument, the prosecutor narrowed her request to the first of the three calls, made April 29, 2023.  After listening to that call, the trial court initially stated that it was "at a loss as to what evidentiary value it has."  After hearing further argument, however, the court indicated it would reevaluate during trial whether to admit the call "to show the dynamics of the relationship that supports the [battered person] syndrome."  Defense counsel requested that if the court were to eventually admit the call, that it be redacted to omit references to a DUI and cocaine use.  The court denied the request, reasoning a DUI and drug use "don't amount to anything" compared to the felony charge defendant was facing.

During trial, the prosecutor revisited the admissibility of the jail call "to demonstrate the dynamics between the defendant and [Theresa]."  After hearing further argument, the trial court deemed the call admissible because "it is absolutely relevant to see how the two are getting along, especially immediately after the alleged incident."  Defense counsel renewed the request to sanitize the references to DUI and drug use, as well as to sanitize defendant's use of a "racial slur."  The court granted the request as to the slur and otherwise denied it.

### 2.  Relevant Legal Principles

Under Evidence Code section 1101, subdivision (a), "[c]haracter evidence, sometimes described as evidence of a propensity or disposition to engage in a type of conduct, is generally inadmissible to prove a person's conduct on a specified occasion.  [Citations.]  This ban against admitting character evidence to prove conduct, however, does not prohibit admission of specific acts of misconduct to establish a material fact like intent, common design or plan, or identity ([Evid. Code,] § 1101, subd. (b)), and does not affect

20

the admissibility of evidence regarding the credibility of a witness (*id.*, subd. (c)).” (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159.)  Through Evidence Code section 1109, the Legislature carved out a “specific exception[] to the rule against admitting character evidence in cases involving . . . domestic violence . . . .” (*Villatoro*, at p. 1159; see *People v. Megown* (2018) 28 Cal.App.5th 157, 168 (*Megown*).)

Subject to exceptions not applicable here, Evidence Code section 1109, subdivision (a)(1) provides:  “[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant’s commission of other domestic violence is not made inadmissible by [Evidence Code] Section 1101 if the evidence is not inadmissible pursuant to [Evidence Code] Section 352.”  “ ‘[T]he statute reflects the legislative judgment that in domestic violence cases, as in sex crimes, similar prior offenses are “uniquely probative” of guilt in a later accusation.  [Citation.]  Indeed, proponents of the bill that became [Evidence Code] section 1109 argued for admissibility of such evidence because of the “typically repetitive nature” of domestic violence.  [Citations.]  This pattern suggests a psychological dynamic not necessarily involved in other types of crimes.’ ” (*Megown*, *supra*, 28 Cal.App.5th at p. 168.)

Under Evidence Code section 352, “[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.”  “In the analogous context of evidence of a defendant’s prior sex offenses governed by [Evidence Code] section 1108, our Supreme Court has explained how trial courts should evaluate such evidence under [Evidence Code] section 352:  ‘By reason of [Evidence Code] section

21

1108, trial courts may no longer deem "propensity" evidence unduly prejudicial per se, but must engage in a careful weighing process under [Evidence Code] section 352. Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense.' " (*People v. Disa* (2016) 1 Cal.App.5th 654, 671, quoting *People v. Falsetta* (1999) 21 Cal.4th 903, 916–917.)

We review the trial court's rulings under Evidence Code sections 1109 and 352 for an abuse of discretion. (*Megown, supra*, 28 Cal.App.5th at p. 168.)

### 3. Analysis

The trial court did not abuse its discretion in admitting evidence of defendant's prior domestic violence or of the jail call.

The probative value of defendant's prior instances of domestic violence was not substantially outweighed by the danger of undue prejudice or confusion of the issues. First, the evidence was highly probative of Theresa's fearful state. Although the prior instances involved actual physical harm and the pending charges did not, the fact defendant previously had physically abused Theresa supported the finding she was actually and reasonably in sustained fear upon receiving defendant's threat to physically harm her. The trial court cited this specific rationale in finding the evidence admissible.

22

Second, the evidence was probative of the cycle of violence between defendant and Theresa, which explained in part Theresa's equivocal recantation at trial. Finally, and similarly, to the extent Theresa testified defendant did not, in fact, threaten her, defendant's prior conduct was probative of his propensity to engage in abusive behavior toward Theresa. In short, the evidence was highly probative.

Defendant's stated concerns regarding the danger of undue prejudice and confusion of the issues are unpersuasive. Defendant asserts prior instances of actual physical abuse are more inflammatory than the charged verbal conduct. We are not convinced the jury would have found them more inflammatory than a credible and specific death threat. Nor are we persuaded the jury was likely to confuse the prior incidents with the pending charges. Different witnesses from different law enforcement agencies testified about the prior conduct and the pending charges; the prior conduct and pending charges involved different types of conduct committed at different times; and the jury learned that defendant was charged and punished in connection with some of his prior conduct, thus minimizing the likelihood the jury would use this case as an occasion to punish defendant for past conduct.

We are likewise unpersuaded that the jail call's probative value was substantially outweighed by the risk of undue prejudice from defendant's references to a DUI and cocaine use. The call was highly probative of the cycle of violence and defendant's efforts to dissuade Theresa from pursuing charges, which explained in part Theresa's equivocal recantation at trial. In contrast to defendant's credible and specific death threat and properly admitted evidence regarding his prior physical abuse of Theresa, it was unlikely the jury would have been inflamed by nonspecific references during

23

the jail call to a DUI and cocaine use.  The risk that references during the jail call to cocaine use would inflame the jury was further minimized by the fact that the jury had already heard about defendant's cocaine use from the recording of Theresa's statement on Officer Farren's body-worn camera, about which defendant does not complain.

Accordingly, the trial court did not abuse its discretion in admitting evidence of defendant's prior domestic violence or the jail call.

### C.  Cumulative Error

Defendant contends the cumulative prejudicial effect of the trial court's errors warrant reversal.  Because we have assumed the existence of only one error — the trial court's failure to instruct on the lesser included offense of attempted criminal threat, which was harmless — "there is nothing to cumulate." (*People v. Grimes* (2016) 1 Cal.5th 698, 737.)

## IV.  DISPOSITION

The judgment is affirmed.

RUBIN, J.

WE CONCUR:

O'ROURKE, Acting P. J.

DO, J.

24